# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOHN P. LANKFORD,          )
                          )
           **Plaintiff,**      )
                          )     **Civil Action No. 3:06-1214**
        **v.**                 )     **Judge Wiseman / Knowles**
                          )
MICHAEL J. ASTRUE,      )
**Commissioner of Social Security**  )
                          )
          **Defendant.**     )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 17. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 19-1. Plaintiff has filed a Reply. Docket Entry No. 20.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment Based on the Administrative Record be GRANTED, and that this case be REMANDED.

## I. INTRODUCTION

Plaintiff filed his application for Supplemental Security Income ("SSI") benefits on

1

January 27, 2004, alleging that he had been disabled since November 1, 1974, due to attention deficit hyperactivity disorder ("ADHD") and other psychological problems. *See, e.g.,* Docket Entry No. 13, Attachment ("TR") 49, 72. Plaintiff's application was denied both initially (TR 27-28) and upon reconsideration (TR 29-30). Plaintiff subsequently requested (TR 38) and received (TR 21-24) a hearing. Plaintiff's hearing was conducted on February 2, 2006, by Administrative Law Judge ("ALJ") Linda Gail Roberts. TR 241. Plaintiff and Vocational Expert ("VE") Dr. Kenneth Anchor, appeared and testified. TR 241-242.

On June 1, 2006, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 12-20. Specifically, the ALJ made the following findings of fact:

1. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.920(b) and 416.971 *et seq.*).

2. The claimant has the following severe impairments: generalized depressive disorder, antisocial personality disorder, and substance abuse disorder in remission (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at all exertional levels and simple, repetitive work with no contact with the public and limited contact with coworkers.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on January 11, 1965 and was 41 years old on the day of the hearing, which is defined as a

2

younger individual 18-44 (20 CFR 416.963).

7.   The claimant has at least a high school education and is
     able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the
     claimant does not have past relevant work (20 CFR
     416.968).

9.   Considering the claimant's age, education, work
     experience, and residual functional capacity, there are jobs
     that exist in significant numbers in the national economy
     that the claimant can perform (20 CFR 416.960(c) and
     416.966).

10.  The claimant has not been under a "disability," as defined
     in the Social Security Act, at any time through the date of
     this decision (20 CFR 416.920(g)).

TR 14-15, 19-20.

On July 11, 2006, Plaintiff timely filed a request for review of the hearing decision.  TR

9.  On October 17, 2006, the Appeals Council issued a letter declining to review the case (TR 5-

7), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This civil

action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the

Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to ADHD and other psychological problems.  TR 72.

On November 15, 1974, Dr. Howard T. Sitton, Jr. of the State of North Carolina

Department of Mental Health wrote a report about Plaintiff (then nine years of age) at the request

of Mrs. Shirley Ritchie of Overton Elementary.  TR 153-154.  He evaluated Plaintiff for

3

academic placement and planning based on three prior psychological evaluations of Plaintiff performed by himself and by Dr. Deborah H. Massey. TR 153. Dr. Sitton noted that Plaintiff had demonstrated a short attention span and had become more active toward the end of each testing session. *Id.* Plaintiff obtained an overall I.Q. score of 87 based on the Wechsler Intelligence Scale for Children. *Id.* Plaintiff's score on the Wide Range Achievement Test indicated that he was reading, spelling, and doing arithmetic within the second grade level, and the Gilmore Oral Reading Test indicated that had a reading accuracy grade level within the first grade level and a comprehension within the third grade level. TR 154. These scores indicated that the fourth-grader had "a significant deficit in academic ability which seem[ed] to come from a mild learning disability and his short attention span." *Id.* Plaintiff was not diagnosed with ADHD or any other formally recognized learning disability at that time. TR 153-154. Dr. Sitton noted that Plaintiff took a negative attitude toward some test demands, which reduced his performance on some of the tests. TR 153. He noted, however, that Plaintiff was motivated to achieve in his areas of interest. *Id.* Dr. Stitton recommended that, in academic planning and scheduling, administrators consider Plaintiff's sensitivity about academic underachievement and his motivation to achieve socially. TR 154.

On September 28, 1983, at age eighteen, Plaintiff was involuntarily committed to Broughton Hospital ("Broughton"), where he remained until he was discharged by the court on December 29, 1983. TR 118-119. Dr. Rudy Santoso noted that Plaintiff "has this date[1] attempted suicide, once with a gun and once with a knife." TR 118. Dr. Santoso further stated,

---

[1] The form was dictated after and attendant to Plaintiff's discharge. TR 118. It appears, however, that "this date" refers to the date Plaintiff was committed to the hospital.

"He may be under the influence of drugs." *Id.* Plaintiff was placed on "suicidal precautions," which were discontinued on October 5, 1983. *Id.* Dr. Santoso examined Plaintiff and found him to be normal physically with a negative drug screen. TR 118. Dr. Santoso noted that Plaintiff seemed to have impaired judgment and insight, that he used denial frequently and had little or no insight into behaviors, and that he was impulsive and had problems with problem-solving and goal-orientation, including difficulties scheduling his daily activities and meeting the demands of daily living. TR 118-119. Upon discharge, Dr. Santoso stated that Plaintiff "uses denial and repression, evasive, circumstantial, manipulative." TR 119. Plaintiff participated in ward milieu, group therapy, and recreational therapy, and was referred for vocational evaluation and industrial therapy. TR 118. Plaintiff managed the self-care skills program with "minimal difficulty." TR 119. Plaintiff did not complete a diary as required for the group diary session with which he was involved, and Plaintiff "eloped on several occasions." *Id.* Dr. Santoso noted that Plaintiff was also involved in at least one episode of severe agitation. *Id.* Dr. Santoso opined, however, that Plaintiff appeared to be motivated to acquire appropriate work skills, consistently attending the assigned vocational rehabilitation session. *Id.* When Plaintiff was discharged by the court, he chose not to continue in the program, despite the medical staff's opinion that he could benefit from treatment. *Id.* Plaintiff's diagnoses upon discharge were Personality Disorder Mixed and Mixed Substance Abuse. *Id.* Plaintiff had no regular medication when he was discharged. *Id.*

On April 6, 1984, Plaintiff was again admitted to Broughton on a petition for involuntary commitment for attempting to hang himself and superficially cutting his wrists while in jail. TR 120. He remained at Broughton until May 10, 1984. *Id.* Plaintiff admitted to making the

5

suicidal gestures to get out of jail and into Broughton. *Id.* Chris Kern, physician's assistant for Dr. Michael Knoelke, found that Plaintiff's orientation and memory were intact, and that his thinking was generally goal-oriented. TR 120. P.A. Kern reported that Plaintiff had no outbursts during his stay, but was sullen and withdrawn with periods of anxiety. *Id.* He was characterized as anxious, moody, and mildly hyperactive, with mild depressive symptomology, low self-esteem, indecisiveness, a hopeless outlook on life, poor impulse control, and a tendency toward self-destructive and threatening episodes. TR 120-121. P.A. Kern reported that Plaintiff showed poor insight and poor judgment, and that he responded poorly to Broughton's treatment modalities. TR 121. Plaintiff's final diagnoses were adjustment disorder with mixed disturbance of emotions and conduct, and anti-social personality disorder. TR 121. While at Broughton, he received small dosages of Vistaril at bedtime and some PRN medicine for episodes of anxiety, along with Anacins for occasional headaches. TR 120. Plaintiff was discharged with a poor prognosis and returned to jail with a fourteen-day supply of Vistaril at fifty milligrams. *Id.*

On February 17, 1985, Plaintiff was admitted to Broughton for a third time, involuntarily, for trying to commit suicide by drinking Iodine. TR 122. Plaintiff chose not to remain in the hospital when his commitment expired on March 23, 1985. TR 123. Dr. C. H. Lee noted that Plaintiff denied suicidal intent, stating that drinking Iodine was "just something stupid" that he did. TR 122. The doctor's other findings regarding psychiatric symptoms on admission and mental states were that Plaintiff was cooperative, alert, oriented in all spheres, with clear and coherent speech with no evidence of psychotic features, and a long history of drug abuse. *Id.* Dr. Lee noted that Plaintiff denied dangerousness to himself or others, his affect was flat, his intellectual functioning was average, and his insight and reality testing were intact with

6

judgment slightly impaired by history. *Id.* He opined that Plaintiff had good personal hygiene, appropriate behavior, and that he appeared able to work and had no problem expressing his wants and needs, but that his impulse control was poor. *Id.* Plaintiff had no noted physical abnormalities, aside from tonsillitis which developed in mid-March. *Id.* Plaintiff was placed in a psychiatric ward where he was closely observed and placed on psychotropic medication, including Vistaril for anxiety,[2] and his mental condition "stabilized." *Id.* Plaintiff was discharged with a diagnosis of antisocial personality disorder and acute tonsillitis, leaving with medication only for the tonsillitis. TR 122-123.

On August 8, 1996, Plaintiff was admitted to rehabilitation under the care of Counselor Thomas Taylor at Lloyd C. Elam Mental Health Center ("Elam") of Meharry Health Services for alcohol abuse.[3] TR 155-156. Plaintiff was discharged upon completion of rehabilitation on August 20, 1996. *Id.* Plaintiff received treatment in the form of group therapy, Narcotics Anonymous, Alcoholics Anonymous, individual sessions, and family therapy. TR 155-157. In an emotional and psychological assessment, Plaintiff was found to be normal, average, and cooperative, although his dress was noted as unusual. TR 156-157. Plaintiff was not classified as suicidal or homicidal. TR 156. Plaintiff was discharged with a good rating in adaptive functioning at last encounter, and a good prognosis. TR 155.

---

[2] It is unclear whether Vistaril was the only psychotropic drug administered during this stay at Broughton.

[3] These records refer only to "Meharry Health Services" and "Meharry Community Mental Health Center." TR 155-156. Additionally, only "Taylor" is legible in the counselor's signature on the discharge summary. TR 155. A summary of Plaintiff's rehabilitation stay written in 2004 (*infra*), however, lists the name as Lloyd C. Elam Mental Health Center and states that Plaintiff's counselor was Thomas Taylor. TR 130.

On March 8, 2004, John Worsham, LADAC (licensed alcohol and drug abuse counselor), of Elam wrote a summary regarding Plaintiff's period of enrollment in Elam's Medical Detoxification and Residual Rehabilitation Program from August 8, 1996 to August 20, 1996. TR 130. Mr. Worsham stated that Plaintiff's records showed successful completion of the rehabilitation program under Mr. Taylor. *Id.* Mr. Worsham emphasized a lack of contact with Plaintiff since his discharge, but pointed out that there were no noted limitations of any functional abilities, nor any limitation of listed mental abilities when Plaintiff was admitted. *Id.*

Also on March 8, 2004, Dr. Robert Lane, Ed.D., performed a psychological evaluation of Plaintiff at the request of the Tennessee Department of Human Services, Division of Rehabilitation Services, Disability Determination Section. TR 131-135. Dr. Lane noted that Plaintiff made eye contact, established rapport with the examiner, and appeared to be invested in the examination, but refused to answer some questions. TR 131. In the course of the evaluation, Dr. Lane questioned Plaintiff on his background. TR 132. Plaintiff stated that he had no medical problems and that, at the time, he was not taking any medication. *Id.* He further stated that he had begun using alcohol and marijuana at age 11 and had used them daily until he was sent to prison seven years prior to the evaluation. *Id.* Dr. Lane noted that Plaintiff's records indicated a history of substance abuse, including cocaine and heroin, with Plaintiff participating in several substance abuse programs with no lasting effect. *Id.* Dr. Lane pointed to records indicating that Plaintiff had been unable to maintain employment because of substance abuse. *Id.* Dr. Lane also noted that Plaintiff, having recently lost a job at Shoney's and facing impending return to federal prison for failing to keep a job while in a halfway house, stated, "All they get me is chicken shit jobs that don't pay anything." *Id.* Plaintiff also "launched into a

8

diabatribe" about the criminal justice system. *Id.* Plaintiff reported years of difficulty sleeping, usually sleeping about five hours per night. *Id.* Plaintiff further reported many years of difficulty staying focused on task, problems with short-term memory, and feelings of sadness, irritability, and lethargy. *Id.* Plaintiff reported liking himself and enjoying spending time with family and friends, but difficulty maintaining appropriate behavior and controlling his temper. *Id.* Plaintiff further reported having no problems with his sex drive, appetite, or the ability to remember "what people tell him." *Id.*

Dr. Lane found that Plaintiff's short term memory was not impaired, as Plaintiff was able to recall recent activities. TR 133. He further noted that Plaintiff's concentration was within normal limits, as demonstrated by his giving appropriate responses to decision-making scenarios. TR 131. Dr. Lane noted that the Rorschach test results were invalid, due to Plaintiff's refusal to fully participate in the test, but that all other test results were valid. *Id.* Dr. Lane noted that Plaintiff denied any suicidal or homicidal ideation, intent, or plan at the time. TR 133. Dr. Lane administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") to Plaintiff, who scored a full scale IQ of 87, which is in the "low average" range of measurable intelligence. *Id.* Dr. Lane also administered a Wide Range Achievement Test 3 ("WRAT 3"), which yielded scores placing him in the "average" classification for reading and the "low average" classification for arithmetic. *Id.* Dr. Lane found the difference between the WAIS-III and the WRAT 3 was not significant enough to satisfy requirements for diagnosing Plaintiff with a learning disorder. *Id.*

In Dr. Lane's assessment of Plaintiff's ability to do work-related activities, he reported that Plaintiff could understand simple instructions and make simple work-related decisions, but

9

that "his irritability limit[ed] his ability to work with the general public and co-workers, or accept criticism from supervisors." TR 134. He added that Plaintiff's "lethargy" hindered his abilities to maintain consistent schedules and attendance and to sustain a typical work routine. *Id.* Plaintiff reported capability in daily living activities, including preparing his meals, managing his finances unassisted and running errands, using public transportation or walking to get where he needed to go, or making his own daily decisions unassisted. *Id.* Plaintiff was able to make correct change when making cash purchases and was also able to perform simple mental calculations. *Id.* Dr. Lane indicated that Plaintiff had the abilities to maintain basic standards of cleanliness and to travel unaccompanied in unfamiliar places. *Id.* Dr. Lane noted Plaintiff's prior history of opioid, cocaine, cannibas, and alcohol abuse. TR 135. He stated that, as a result of repeated use and withdrawal, drug abuse could often lead to chronic problems with depression, relationships, and employment. TR 134-135. Dr. Lane also opined that Plaintiff's repeated violations of the law had made it difficult for him to maintain regular employment. TR 134. Dr. Lane diagnosed Plaintiff with Depressive Disorder NOS, Personality Disorder NOS, and Antisocial Personality Disorder. TR 135.

On March 23, 2004, Dr. Victor A. Pestrak completed a "Psychiatric Review Technique" form and "Residual Functional Capacity Assessment - Mental" form regarding Plaintiff. TR 136-152. Dr. Pestrak diagnosed Plaintiff with depressive disorder NOS (TR 139) and anti-social personality disorder (TR 143). Dr. Pestrak noted that Plaintiff's substance addiction disorder was in remission. TR 144. He opined that Plaintiff was mildly limited in activities of daily living, moderately limited in maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace. TR 146. Dr. Pestrak noted that Plaintiff had no

10

episodes of decompensation (*id.*), and that Plaintiff could travel, visit friends, read, prepare simple meals, do chores, pay bills, use the phone, and run errands. TR 148. Dr. Pestrak further noted that Plaintiff was living in a halfway house at that time. *Id.*

In his Mental Residual Functional Capacity Assessment of Plaintiff, Dr. Pestrak found Plaintiff moderately limited in his abilities to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and week, and perform at a consistent pace without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. TR 150-151. He found Plaintiff markedly limited in his ability to interact appropriately with the general public. TR 151. Dr. Pestrak found Plaintiff not significantly limited in the remaining categories. TR 150-151. Dr. Pestrak added that Plaintiff could adequately carry out simple and some detailed tasks, pay attention and concentrate, persist and keep pace, ask questions, respond to criticism, and respond to changes in work setting. TR 152. Dr. Pestrak believed that Plaintiff could work adequately with others, but would work better alone, and recommended that Plaintiff not work with the public. *Id.*

It appears that Plaintiff entered a treatment program for substance abuse[4] on August 6, 2004, with a plan for two weekly individual counseling sessions and surprise drug screens. TR

---

[4] All signatures, except Plaintiff's, are illegible. TR 192. It appears that this is an involuntary program for Plaintiff as a probationary term, as Plaintiff is listed as "Offender/Defendant" and "US probation" is found on the top of the page. *Id.* An "officer" listed on the form is Richard A. Martin, who is listed in other records as Plaintiff's probation officer. TR 185, 192.

192.

On September 20, 2004, Janice S. Robinson of Centerstone Community Mental Health Centers ("Centerstone") performed a clinical intake assessment of Plaintiff. TR 184-189. She listed Plaintiff's support system as Alcoholics Anonymous. TR 185. Ms. Robinson noted that Plaintiff's participation in the Meharry Alcohol and Drug Abuse program and Black Mountain Substance Abuse Program were mildly effective. TR 187. Plaintiff was not evaluated to be suicidal or homicidal. *Id.*

Also on September 20, 2004, Ms. Robinson completed a CRG assessment of Plaintiff. TR 158-160, 193-195. She found that Plaintiff did not have any problems performing daily routine activities without assistance, or any problems with concentration, task performance, and pace; and she remarked specifically that Plaintiff denied having any problems. TR 158, 159, 193. She found that Plaintiff had mild problems with interpersonal functioning, remarking that Plaintiff was irritable and arrogant, blamed others for his problems, and had problems with authority figures. TR 158. She also found that Plaintiff had mild problems with adapting to change, remarking specifically that he had difficulty adjusting to community life since his release from prison and had difficulty with sleep. TR 159. She listed Plaintiff as belonging to the group four bracket of the CRG group code, referring to those persons having only mild or moderate mental disorders. TR 160, 194. She found that Plaintiff had not been suicidal or homicidal in the past five years, and that his highest and lowest GAF scores within the six previous months were all sixty. TR 160, 195. Ms. Robinson noted, however, that she only had "minimal" information in making this CRG assessment. TR 160, 194.

On September 29, 2004, Plaintiff began orientation for group therapy at Centerstone. TR

182- 183.  There was no mental status update for that note, but Vincent Ruzzo, LADAC, recorded that Plaintiff did not have suicidal or homicidal ideation.  TR 182-183.

On October 6, 2004, Plaintiff had a group therapy session with Mr. Ruzzo.  TR 180-181. He evaluated Plaintiff's mental status as follows: appearance, mood and affect, and behavior were appropriate; his speech was organized, his thought process was normal; his thought content was within normal limits; and his insight, judgment, and motivation for treatment were fair, and Plaintiff exhibited "no vegetative disturbance."  TR 178.  Mr. Rizzo noted no hallucinations, delusions, phobias, threats of harm to others, self-injurious behavior, or suicidal or homicidal ideation.  TR 178.  Mr. Ruzzo did not suspect substance abuse at the time of his evaluation.  *Id.* Mr. Ruzzo noted that Plaintiff was fair in affect and attentive to group process, but Mr. Rizzo also noted, "no interaction." *Id.*

On October 13, 2004, at a group therapy session, Mr. Ruzzo reported Plaintiff's mental status was the same as at the October 6 session. TR 178-179.  Mr. Ruzzo remarked that Plaintiff was attentive to group process and that he had a positive attitude.  TR 179.

On October 20, 2004, at a group therapy session, Mr. Ruzzo found no change in the mental status category, except that Plaintiff's motivation for treatment was poor.  TR 176-177. Although Mr. Ruzzo again found Plaintiff attentive to the group process, as well as to a video, he noted that Plaintiff verbalized anger over his perception of the injustice of drug laws, and that Plaintiff was struggling to meet guidelines and control anger, although Plaintiff was able to discuss this with the counselor.  TR 177.

On October 27 and November 3, 2004, Plaintiff failed to appear for his scheduled group sessions at Centerstone. TR 174-175.

13

On November 10, 2004, Mr. Ruzzo found Plaintiff's mental status the same, with the exception of mood and affect, which were anxious but appropriate. TR 172-173. He found Plaintiff less angry, but opined that Plaintiff might benefit from anger management. TR 173.

On November 17, 2004, Mr. Ruzzo rated Plaintiff's mental status as follows: appearance and behavior were appropriate; mood and affect were labile; speech was organized; thought process was normal and thought content was within normal limits; insight and judgment were good, motivation for treatment was fair, and again there were no hallucinations, delusions, phobias, vegetative disturbance, threats of harm to others, self-injurious behavior, or suicidal or homicidal ideation. TR 169-170. Mr. Ruzzo did not suspect substance abuse at the time of the evaluation. *Id*. Mr. Ruzzo noted that Plaintiff was active and behaved appropriately in group. *Id*.

On the same day, Plaintiff met with Susan Slonecker for individual therapy. TR 171. She discussed with Plaintiff the possibility of his getting involved in vocational rehabilitation, and planned to follow up with Plaintiff in two weeks. *Id*. The next day, Plaintiff called Ms. Slonecker requesting assistance with the process of joining vocational rehabilitation. TR 168.

Plaintiff did not undergo a mental status examination for the group session occurring December 1, 2004. TR 166-167.

On December 2, 2004, Plaintiff was listed on Centerstone's Current DSM Diagnosis form as having "alcohol dependence in remission," "antisocial personality disorder," and "problems related to interaction with the legal system." TR 190. It was also noted that Plaintiff

14

was on "supervised release US probation."[5]  *Id.*  Plaintiff's then-current, highest, and lowest GAF scores were all sixty. *Id.*

On December 9, 2004, therapist Susan Slonecker noted that Plaintiff had cancelled his appointment. TR 163.  On the same day, she noted that Plaintiff had called to discuss the possibility of being returned to prison for contacting an employee who worked at the prison from which he had been released. TR 165.  She found that he did not express suicidal or homicidal ideation or voice a threat of harm, and there was no report of self-injurious behavior and no alcohol or drug abuse suspected.  TR 164.

On January 4, 2005, Plaintiff sought care from Prison Health Services for extreme anxiety and panic attacks, which he declared "an emergency."  TR 206.  He was referred to a mental health care provider.  *Id.*

In a progress note from Prison Health Services dated January 6, 2005, Barbara Hysong, R.N., M.S.N., noted that Plaintiff had mood swings and difficulty coping, and that his panic attacks were "painful and uncomfortable."[6]  TR 203.  She described Plaintiff's behavior as agitated, with good eye contact and appropriate responses to questions, although she indicated that he had altered perception.  *Id.*  She noted that Plaintiff was treated with Benzodiazepam (although it is unclear whether that treatment was contemporaneous or in the past), that Plaintiff refused to take Phenothiazine, and that he was unable to take Vistaril.  *Id.*  She referred Plaintiff

---

[5] It is unclear who was the diagnosing physician, although the document was created by Janice Robinson.

[6] The progress note states that Plaintiff was a federal prisoner, who had been on probation following a prison term of seven and a half years, but who had been arrested for a probation violation.

15

to a psychiatrist. *Id.* He began taking Trilafon on the same day. TR 200, 202.

On January 7, 2005, Plaintiff complained that Trilafon made him feel "awful," and he requested a change in prescription. TR 199.

On January 10, 2005, Dr. Treadway noted that Plaintiff was not having temper outbursts and was not suicidal, but that he had some depression, severe anxiety, and mood swings. TR 204. Dr. Treadway diagnosed Plaintiff with anxiety disorder and prescribed Inderal at twenty milligrams, Depakote at five hundred milligrams, Pamelor at fifty milligrams, and recommended a follow-up in ninety days. *Id.*

On January 12, 2005, Plaintiff made a sick call request. TR 204. Plaintiff "requested side effects of his medication." *Id.* Plaintiff stated that he was "feeling bad." *Id.* Plaintiff did not, however, wish to have his medication discontinued. *Id.*

On January 17, 2005, Plaintiff made another sick call request, stating that his medications were not helping. TR 205. Plaintiff decided that he was willing to try Phenothiazine and he wanted his Inderal and Pamelor discontinued. TR 205, 202. Plaintiff was referred to Dr. Treadway, who discontinued his Inderal and Pamelor and prescribed him fifty milligrams of Thorazine, twenty-five milligrams of Benadryl, and an increased dose of Depakote. *Id.*

On January 18, 2005, Plaintiff submitted a sick call request stating that he was going to discontinue his medications because he felt that he was not benefitting from their use. TR 196. Plaintiff requested Halcion, which he had taken in the past with good results, although he remained open to other medications. *Id.*

On January 21, 2005, therapist Elizabeth Swope cancelled Plaintiff's therapy appointment at Centerstone because of his incarceration. TR 161.

16

On December 21, 2005, one week after Plaintiff was released from prison, Dr. Casey C. Arney performed an independent psychiatric evaluation of Plaintiff, which included an interview lasting one and one half hours. TR 209-212. During the interview, Plaintiff was reportedly somewhat agitated because he had had difficulty finding the doctor's office, but he engaged in the evaluation without distraction. TR 209. Plaintiff reported a long history of unstable interpersonal relationships dating back to his teenage years, which Dr. Arney opined contributed to a marked inability to maintain stability in his life. *Id.* Plaintiff explained his multiple failed attempts at maintaining employment as resulting from his "cussing out" his boss, losing his temper, or speaking his mind. *Id.* Dr. Arney noted Plaintiff's impatience, frustration, and unwillingness to pursue uncomfortable details, as evidenced by remarks such as "I can't make it any clearer," or "My attorney has my work history." *Id.* Dr. Arney opined that Plaintiff's relationship problems were fed by his underlying attitude of entitlement and intolerance to frustration, and he noted that Plaintiff had little capacity for self-reflection and tended to blame others when things did not go well in his life. TR 210. He further noted that Plaintiff exhibited wide mood swings daily, accompanied by anxiety, as a reaction to occurrences in his environment, especially related to uncertainty in his life and relationships. *Id.* These symptoms included occasional feelings of sadness and agitation. *Id.* Plaintiff reported "very fragmented" sleep. *Id.* Dr. Arney found that these mood symptoms did not meet the criteria for major depression or bipolar disorder. *Id.* Plaintiff told Dr. Arney he would not take medications because he did not see results from them. *Id.*

Dr. Arney noted Plaintiff's long history of polysubstance abuse, reporting that alcohol and drug abuse were "minimized significantly." TR 210. Plaintiff reported that he did not

17

believe that alcohol and drug treatment, and twelve step programs specifically, had helped.  *Id*.

Dr. Arney noted that Plaintiff appeared restless and mildly agitated throughout the interview, and that he was impatient and persistently vague in his answers, refusing to elaborate when questioned repeatedly.  TR 211.  Dr. Arney noted that Plaintiff's mood was "up and down," his affect was mildly labile, leaning toward impatience and expression of frustration.  *Id*. His thought process was reasonably organized with no signs of Formal Thought Disorder, tangentiality, circumstantiality, suicidal or homicidal ideation, paranoia, delusion or hallucinations.  *Id*.  Plaintiff was reported to be alert and oriented, and he performed "serial 7's from 100 to 65 correctly."  *Id*.  He recalled three out of three objects at three minutes, and his digit span was five numbers in a forward direction, although he refused to try numbers in a reverse direction.  TR 211.  Plaintiff quickly became impatient with cognitive evaluation and did not wish to continue it.  *Id*.

Dr. Arney diagnosed Plaintiff with Personality Disorder NOS with borderline and antisocial features, as well as abuse of alcohol, marijuana, opiates, and cocaine, all four of which were in "early full remission."  TR 211-212.  Dr. Arney specified that Plaintiff's borderline personality patterns included unstable intense interpersonal relationships, marked identity disturbance, impulsivity in areas that were potentially self-damaging, recurrent suicidal behavior in the past, affective instability due to a marked reactivity of mood, and inappropriate intense anger or difficulty controlling anger.  *Id.*  Dr. Arney specified that Plaintiff's antisocial personality features included failure to conform to social norms with respect to lawful behaviors; impulsivity and failure to plan ahead; irritability and aggressiveness; reckless disregard for safety of others; repeated failure to sustain consistent work behavior or honor financial

18

obligations; and lack of remorse.  *Id*.  Dr. Arney stated that Plaintiff's personality disorder symptoms were significant and exacerbated by his substance abuse.  TR 212.  He noted, however, that substance abuse was not the primary cause of these symptoms, because these symptoms failed to subside despite the absence of substance abuse while Plaintiff was in prison. TR 212.  Dr. Arney believed that Plaintiff's personality disorder rendered him extremely limited in his abilities for social interaction and markedly limited in some aspects of sustained concentration and persistence.  *Id.*

On January 6, 2006, Dr. Arney completed a Medical Source Statement Regarding Mental Abilities for Plaintiff.  TR 207-208.  Dr. Arney evaluated Plaintiff as extremely limited in his abilities to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes.  TR 208.  Dr. Arney found Plaintiff markedly limited in his abilities to work in coordination with or in proximity to others without being unduly distracted by them, to complete a normal workday and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace.  TR 207.  Dr. Arney found Plaintiff moderately limited in his abilities to respond appropriately to changes in a routine work setting, to maintain attention for extended periods of two hour segments, to maintain regular attendance and be punctual, and to sustain an ordinary routine without special supervision.  TR 207-208.  Dr. Arney found no other significant limitations.  *Id.*

A Centerstone document from February 23, 2005, listed alcohol dependence in remission and antisocial personality disorder as Plaintiff's then-current DSM diagnoses, and noted Plaintiff's "problems related to interaction with the legal system.  TR 191.  His then-current,

19

highest, and lowest GAF scores were sixty.  *Id.*

**B.  Plaintiff's Testimony**

Plaintiff was born on January 11, 1965, and has an eighth grade education, a general equivalency diploma ("GED") earned in 1986, and certificates in typing and computers that he earned while incarcerated.  TR 244-245.

Plaintiff testified that he had been incarcerated for most of his adult life.  TR 245.  In discussing his problems, he stated "when you've been crammed in a. . . eight-by-twelve foot cell with three people. . . for seven straight years. . . and been in maximum security prisons. . . treated like garbage..."  TR 247.  Plaintiff stated that he was unable to work because of a grave difficulty functioning in society.  *Id.*  Plaintiff testified that he had never held a job over ninety days, adding that he had worked at "low-level, menial-type. . . minimum-wage jobs" and that he had been fired from all them.  *Id.*  Plaintiff testified that he became frustrated easily, and he reported that this was becoming worse.  TR 247-248.  Plaintiff described the reasons for his terminations as, "Disputes with management, I, you know, I mean, I don't, it's, I, I don't know.  I don't remember."  TR 248.  Plaintiff testified that he thought "the record speaks for itself" regarding his ability to get along with people and that he did not spend time with friends.  *Id.*

Plaintiff testified that he did not have a set routine or schedule, but that he read the newspaper and watched television.  TR 248.  Plaintiff reported that his living situation was "[v]ery dismal," and that he slept wherever he could get a roof over his head– including the rescue mission and his parents' home.  *Id.*  Plaintiff testified that he did not stay with his parents all the time because they were elderly, and he could not give any further explanation.  *Id.*

Plaintiff reported that he did not engage in substance abuse while in prison, adding that

20

"they [had] random drug testing."  TR 248.  Plaintiff testified that he was "clean now."  TR 248-249.

Plaintiff testified that he was not in treatment for his emotional problems, that he did not take any medications, and that he did not have any physical problems.  TR 249.  Plaintiff acknowledged that "Legal Services" had sent him to a psychiatric evaluation on December 21, 2005, and that he approximated the evaluation to have lasted between one and "a couple" hours. *Id.*

### C.  Vocational Testimony

Vocational Expert ("VE"), Dr. Kenneth Anchor, also testified at Plaintiff's hearing.  TR 249-255.  The VE reported that Plaintiff was a "younger worker" who holds a GED, and has had some additional courses.  TR 250.  The VE testified that Plaintiff had no past relevant work.  *Id.*

The ALJ presented the VE with three hypothetical situations paralleling that of Plaintiff. TR 250-256.   The first hypothetical consisted of a claimant the same age, and that had the same education and work history, as Plaintiff.  TR 250.  The ALJ added that for this hypothetical the claimant would have the "pain and impairment," which restricted his abilities as that found in the medical source statement in Exhibit 8F.  TR 250-251. The VE acknowledged that the claimant in such a case would not be able to do his past work because he would not have any.  *Id.*  The VE reported that he needed to refer to the exhibits, and the ALJ decided to "pass that over" before receiving an answer.  TR 251.

For the second hypothetical, the ALJ instructed the VE to use Exhibit 8F  "for the mental," with "no exertional, no physical impairments, non-severe."  TR 251.  The ALJ asked if there would be jobs available in the United States economy, and in Tennessee, for such a

claimant. *Id.* The VE answered that the hypothetical claimant could work various jobs, all of which were unskilled. TR 251-252. The VE testified that, at the medium exertional level, the hypothetical claimant could be a dishwasher, and noted that there would be approximately 8,000 dishwasher jobs in Tennessee and 450,000 nationwide. TR 251- 252. The VE reported that the dishwasher job was at the lower end of the stress continuum – fairly routine, repetitive, and entry-level. TR 252. The VE testified that another medium-level job would be a stocker, with over 6,000 positions in Tennessee and over 300,000 nationwide. *Id.*

At the light exertional level, the VE testified that the hypothetical claimant could perform the job of machine tender, with over 14,000 positions in Tennessee, and more than 800,000 nationwide, and could also be a packer, with over 5,000 packer jobs in Tennessee and over 260,000 nationwide. TR 253.

The VE testified that another possible job for the hypothetical claimant at the levels of sedentary, light, and medium, would be an assembler. The VE testified that in the aggregate there are 9,000 assembler jobs in Tennessee and over 500,000 nationwide. TR 253. The VE testified that, for the assembler job at the medium exertional level, there would be in excess of 3,000 positions in Tennessee and in excess of 150,000 nationwide. *Id.* The VE testified that, for the packer position at the medium level, there would be over 2,800 positions in Tennessee and more than 125,000 in the nationwide. TR 253-254.

For the third hypothetical, the ALJ instructed the VE to use the same hypothetical from hypothetical two, but consider a "physical exertion of none, non-severe, with a mental . ..[from Exhibit] 12F." TR 254. The VE testified that such a hypothetical claimant could not "function[] in a conventional workplace on a full-time basis." *Id.* The VE testified that he was not aware of

any conflict of the evidence he provided with the Dictionary of Occupational Titles. *Id.*

The VE testified that if Plaintiff exhibited an ongoing pattern of behavior as described "on page four of Dr. Arn[ey]'s report," consisting of a markedly limited frustration tolerance, and impulsive behaviors that translate to self-sabotage on jobs, with interruptions in job performance and job relationships, Plaintiff would not be able to do any of the jobs identified by the VE in regard to Exhibit 8F. TR 255.

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different

23

conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

24

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

---

[7]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in not following 20 C.F.R. § 416.927 by not giving controlling weight to Dr. Arney's opinion. Docket Entry No. 18. Plaintiff contends that the ALJ's assessment of the opinion of Dr. Arney is not supported by substantial evidence because, 1) the ALJ disregarded pertinent evidence and inaccurately reported other evidence; 2) the ALJ disregarded Social Security law and pertinent medical opinion in her assessment of Mr. Lankford's past substance abuse; and 3) the evidence cited by the ALJ for discounting Dr. Arney's opinion cannot constitute substantial evidence. Docket Entry No. 18 at 9. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, remanded. *Id.* at 19-20.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

26

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

As noted, Plaintiff argues that the ALJ did not accord appropriate weight to Dr. Arney's opinion. Docket Entry No. 18 at 9-10. The ALJ in the case at bar mentioned three opinions- those of Dr. Arney, Dr. Lane, and Dr. Pestrak. TR 15-19. Dr. Arney was an examining physician retained by Plaintiff's counsel; Dr. Lane was a DDS medical examiner; and Dr. Pestrak was a DDS consultative examiner.

Plaintiff is correct in his assertion that the Regulations generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 416.927(d)(1). The Regulations also require that, in order to be accorded greater weight, that opinion must be supported by objective medical findings and not inconsistent with other evidence of record. 20 C.F.R. § 416.927(d).

Moreover, when analyzing the evidence and making her determination, the ALJ has a duty to "fully and fairly develop the administrative record." *See Johnson v. Secretary*, 794 F.2d 1106, 1111 (6th Cir. 1986). In doing so, the ALJ must identify the reasons and basis for crediting or rejecting certain items of evidence (*see, e.g., Morehead Marine Services v. Washnock*, 135

27

F.3d 366, 375 (6th Cir. 1998); *Hurst*, 753 F.2d at 519), as there can be no meaningful judicial review without an adequate explanation of the factual and legal basis for the ALJ's decision (*Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (1991)).

In the case at bar, the ALJ decided to accord the opinion of DDS consultative examiner, Dr. Pestrak, "significant weight because it is consistent with the evidence of record," and the opinion of DDS medical examiner, Dr. Lane, "significant weight because he was an examining source, provided solid reasoning for his opinion, and was consistent with the evidence of record." TR 18. The ALJ decided to accord Dr. Arney's opinion "less weight although he was an examining source because he is inconsistent with the evidence and based his opinion on a one and a half hour, one-time interview." *Id.* Specifying her rationale for discounting Dr. Arney's opinion, the ALJ stated: "Dr. Avery[8] provided two marked and two extreme limitations when the claimant has had very little psychiatric treatment (medication maintenance while incarcerated and court ordered group therapy) and was not prescribed any medication at the time of the evaluation." *Id.*

While the ALJ extensively explained her reasons for discounting Plaintiff's credibility, including his 43 incarcerations and former alcohol, marijuana, heroin, and cocaine use, the ALJ failed to identify what "objective evidence" she used (beyond Plaintiff's credibility) to determine the weight accorded to each evaluation. *See* TR 14-20. The ALJ reported Dr. Pestrak's findings, but did not discuss the evidence upon which he based those findings. TR 14, 18. Similarly, the ALJ reported things that Plaintiff told Dr. Lane, and reported some of Dr. Lane's findings, but she did not discuss the evidence upon which Dr. Lane based those findings. TR 15-16, 18.

_____

[8] The ALJ, throughout her opinion, mistakenly refers to Dr. Arney as "Dr. Avery."

28

Again, the ALJ reported Dr. Arney's findings, but did not discuss the evidence upon which he based his findings. TR 17-18.

Furthermore, the record contains numerous treatment records that are briefly mentioned, but not discussed, by the ALJ in her decision. For example, the extent to which the ALJ substantively discusses Plaintiff's three hospitalizations at Broughton Hospital is as follows:

> When he was first hospitalized in December 1983, he was not prescribed any medication. His second hospitalization required only 'a small dose of Vistaril at bedtime and some PRN medicine for episodes of anxiety.' He was not prescribed any medication during his hospitalization in 1985.[9]

TR 16 (footnote added). The ALJ completely failed to discuss Plaintiff's treatment, physician notes and observations, physician diagnoses or prognoses, or any other relevant information from his Broughton Hospital stays. Additionally, while the ALJ briefly mentions Plaintiff's Centerstone clinical intake assessment, she failed to discuss any observations contained in Plaintiff's progress notes from his treatment there.

Because the ALJ failed to discuss pertinent treatment records from Broughton Hospital and Centerstone in her decision, the undersigned cannot discern whether she considered them. Accordingly, the ALJ did not fully develop the record or adequately explain the reasons and basis for her conclusions, and remand is appropriate.

Because remand is warranted, the undersigned will not address Plaintiff's remaining statements of error.

---

[9] Contrary to the ALJ's statement, Plaintiff was prescribed Vistaril during his Broughton hospitalization in 1985. TR 122. Additionally, the ALJ makes a passing reference to Plaintiff's hospitalization in 1985 in connection with a discussion of Plaintiff's credibility. TR 15.

# IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be GRANTED, and that this case be REMANDED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any response to said objections.  Failure to file specific objections within ten (10) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:06-cv-01214   Document 27   Filed 06/27/08   Page 30 of 30 PageID #: 122